UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| MICHAEL J. RAFTOGIANIS | : | |
| Debtor | : | Bankruptcy No. 11-10427bf |
| ROMAN M. KRYWOPUSK | : | |
| Plaintiff | : | |
| v. | : | |
| MICHAEL J. RAFTOGIANIS | : | |
| Defendant | : | Adversary No. 11-0315 |

.................................................

MEMORANDUM

.................................................

Before me is a complaint filed by Mr. Roman M. Krywopusk, a creditor and former business partner of the debtor, seeking denial of the debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(a), (4)(A), asserting that the debtor fraudulently transferred property of the estate and, in addition, made false oaths in connection with his bankruptcy case. At trial, however, Mr. Krywopusk focused upon section 727(a)(4)(A). Indeed, his post-trial submission makes no reference to section 727(a)(2)(a).

The debtor, Mr. Michael J. Raftogianis, generally denies that he made any fraudulent transfers or false oaths, and thus maintains that denial of his chapter 7 discharge is unwarranted.

A one-day trial took place, at which only the debtor testified. Upon consideration of the evidence presented, the following facts were proven (stated in narrative format).

I.

Messrs. Raftogianis and Krywopusk are either the sole owners or two out of seven owners of two investment properties located in Brigantine, New Jersey. Complaint and Answer, ¶ 7. These two properties are located at 403 26th Street South and 5100 Ocean Drive South, Brigantine.

In 2009, Mr. Krywopusk brought suit against the debtor in the Superior Court of New Jersey, Chancery Division, making claims involving these two properties. On January 21, 2010, the state court issued a judgment that, inter alia, awarded damages against Mr. Raftogianis in the amount of $650,000, plus post-judgment interest. See Complaint and Answer, ¶ 7 (exhibit A).[1]

Mr. Raftogianis filed the above-captioned chapter 7 bankruptcy case on January 21, 2011. On February 18, 2011, he filed the requisite bankruptcy schedules as well as a Statement of Financial Affairs, along with a declaration under penalty of perjury that he had reviewed those schedules and they were "true and correct to the best of [his]

---

[1] Whether other aspects of the January 21, 2010 state court order, or the plaintiff's alleged receipt of rents from the two Brigantine properties since the date of the judgment, affect the amount currently owing to Mr. Krywopusk, as the debtor implies, would be issues for possible consideration by the state court if the debtor is denied a bankruptcy discharge. They are not before me in this adversary proceeding.

2

knowledge, information and belief." See docket entry #24.[2] Those filings disclosed the following:

On Bankruptcy Schedule A Mr. Raftogianis listed an ownership interest in three real properties: the two Brigantine properties mentioned above and a property in Perkiomenville, Pennsylvania, identified as his residence. Schedule A also listed "a second mortgage" on 5100 Ocean Drive, Brigatine, NJ in the amount of $600,000.

On Bankruptcy Schedule B Mr. Raftogianis disclosed ownership of a bank account in the amount of $500, and a 2005 Honda Odyssey vehicle that he valued at $13,500. The debtor did not disclose an ownership interest in any other personal property.

On Schedule C, the debtor claimed as exempt only his interest in his bank account. On Schedule D, Mr. Raftogianis identified four creditors holding security interests in his property: BAC Home Loan Servicing is listed as holding a mortgage lien on the Perkiomenville realty in the amount of $412,000; the Bank of New York is listed as holding a mortgage lien in the amount of $1.8 million on the 403 26th Street, Brigantine property; U.S. Bank, N.A. is listed as holding a first mortgage lien in the amount of $675,000 on 5100 Ocean Drive, Brigantine; Wells Fargo Bank is listed as holding a second mortgage lien in the amount of $600,000 on 5100 Ocean Drive,

---

[2]Some of the bankruptcy schedules were offered in evidence and were discussed by the debtor in his testimony. As I informed the parties at trial, and to which they had no opposition, I take judicial notice, under Fed. R. Evid. 201 (incorporated into bankruptcy cases and proceedings by Fed. R. Bankr. P. 9017), of the docket entries, declarations and bankruptcy schedules of this case, as well as the statement of financial affairs, insofar as they reflect what the debtor disclosed and when he did so. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995).

Brigantine; and Wells Fargo Dealer Services is identified as holding a lien on the Honda vehicle in the amount of $14,500, with the vehicle valued in the same amount.

On Schedule E, the debtor disclosed that he has no creditors that hold a priority claim. On Schedule F, the debtor listed only two unsecured creditors: Mr. Krywopusk, with a claim in the amount of $731,879.87; and Citi Cards, holding a claim in the amount of $84,316.84.

On Schedule G, Mr. Raftogianis averred that he is not a party to any executory contracts or leases. On Schedule H, he disclosed six co-debtors, including Mr. Krywopusk, as being obligated with him on the secured claim held by the Bank of New York.

On Schedule I, the debtor listed no occupation for himself, nor any wages as the source of monthly income. Instead, he swore that he receives $2,000 monthly in "other" income, but did not identify the source of such income. His expenses on Schedule J are reported to be $2,332 monthly, which included $150 in "club and union dues," $150 in "internet cable," but no rent or mortgage expense.

In his Statement of Financial Affairs, also signed under penalty of perjury, Mr. Raftogianis answered in response to query #1, requesting information "from employment or operation of business," that he had pre-bankruptcy income of only $650 in 2010 and the same amount prepetition in 2011. Again, no source of that income was identified. In response to question #2, the debtor averred that he had no prepetition income other than from his employment or operation of a business.

In response to question #4, seeking information about all litigation within 12 months prior to his bankruptcy filing in which the debtor was a party, Mr. Raftogianis answered as follows:

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| Roman Krywopusk v. Michael Raftogianis, case no. 10-36296 | Judgment | Montgomery County | |
| Roman Krywopusk vs. Michael Raftogianis case no. ATL-C-26-09 | | Superior Court of New Jersey | |
| Raftogianis v. Schmuckler, et al. docket no. ATL-C-106-04 | | Superior Court of New Jersey | |
| US Bank National Association v. Roman Michael Krywopusk, et al. docket no. F-54455-09 | | Superior Court of New Jersey | |
| Bank of New York v. Michael Raftogianis et al. case no. F-7356-09 | Complaint in Mortgage Foreclosure | Superior Court of New Jersey | |

On February 23, 2011, the trustee postponed the scheduled meeting of creditors because, according to the docket entry, the debtor failed to appear. The rescheduled meeting of creditors took place on March 2, 2011, at which time the debtor acknowledged, at trial, that Mr. Krywopusk also attended.

On March 3, 2011, one day after the meeting of creditors, the debtor filed amended Bankruptcy Schedules B, C and D. On Amended Schedule B, the debtor still disclosed the Honda vehicle and bank account, with the same values as before, but listed certain additional personal property: a watch (valued at $50); clothing (valued at $500);

5

and furniture, tools, a television, a computer and "one tractor" (collectively valued at $7,000). On Amended Schedule C, the debtor claimed as exempt all of the personal property that he had added to Amended Schedule B. Amended Schedule D included all of the information averred in the original Schedule D, but added two secured creditors: Mr. Krywopusk, with a claim in the amount of $731,879.87 secured by the two Brigantine properties and also secured by the debtor's Pennsylvania residence ("New Jersey judgment moved to Pennsylvania")[3]; and five co-obligors (not including Mr. Krywopusk) holding a $500,000 "apparent second mortgage" against the 26th Street property in Brigantine.

Also on March 3, 2011, the chapter 7 trustee filed his report stating that no non-exempt assets would be available for distribution to creditors.

At the trial, Mr. Krywopusk demonstrated that certain of the information provided by Mr. Raftogianis in his bankruptcy schedules and statement of financial affairs was either incomplete or inaccurate. For example, in 2010 and through the date of trial, the debtor stated in response to interrogatories that he was employed as a car painter. Ex. P-18. Mr. Raftogianis also acknowledged that between 2000 and 2005 he was employed as a loan officer for various financial entities, and in 2006 was employed by an equity funder. In 2009, he was an employee installing solar panels. Id. Omitted from his statement of financial affairs was disclosure of pending litigation against him by BAC Home Loans Servicing seeking foreclosure of the Perkiomenville realty. Exs. P-19, P-20.

---

[3]Although Mr. Krywopusk's claim was added to the schedule of creditors holding secured claims, the debtor did not also amend Schedule F to delete that same claim as unsecured. Had he done so, the debtor would have asserted that he had only one prepetition unsecured creditor at the time of his bankruptcy filing in January 2011.

6

Mr. Raftogianis admitted that, between 2007 and 2009, his father made loans to him totaling $33,600. Ex. P-18. Although some or all of these loans were unpaid, the debtor failed to list his father as a creditor on his bankruptcy schedules. Also inaccurate was the debtor's averment that Wells Fargo held a $600,000 second mortgage on the realty located at 5100 Ocean Drive, Brigantine, New Jersey. Instead, that property was encumbered in May 2004 by a mortgage in the amount of $644,000 issued by Countrywide Home Loans, Inc., which same lender refinanced that property in April 2007, taking back a mortgage in the amount of $1,400,000. See ex. P-10.

Two assets owned by Mr. Raftogianis were omitted from his bankruptcy schedules. First, he conceded that, in 2007, he loaned $20,000 to Mr. Frank Imbarlina, who was then operating a restaurant called the "Brass Monkey." See Audio, 10:31; ex. P-15 (anwer to interrogatory #70). That loan was never repaid. Id. The debtor testified that he made no collection efforts and decided to forgo any attempt at recovery, especially as the loan was made some years ago to a friend whose restaurant had closed.[4]

Second, Mr. Raftogianis holds a United States patent No. 5,655,786, granted in August 1997. This patent grant concerns "snowboard assemblies." Ex. P-7.

---

[4] The debtor denied knowledge of Mr. Imbarlina's location after the restaurant ceased operations. However, in his answer to the plaintiff's complaint, he mentioned that Mr. Imbarlina moved to Florida when his restaurant closed. See Complaint and Answer, ¶ 20. Moreover, a simple Internet search located Mr. Imbarlina as presently operating The Epicure's Palate in Pittsburgh, Pennsylvania. See http://www.epicurespalate.com. Regarding "Chef-Owner" Frank Imbarlina, that website states:

> Prior to his time in South Florida Frank's previous venture the 'Brass Monkey' in Brigantine, NJ received 'Best of the Shore 2006' by world renowned critic Craig LaBan of the Philadelphia Inquirer, '4-stars' from the Courier Post, '3-stars' from the Press of A.C., and many other accolades from regional print publications, television and radio for his concept and menu.

The debtor testified that he did not reveal this asset on his bankruptcy schedules, although Schedule B query #22 expressly identifies patents as among the personal property to be disclosed, because he had not renewed the patent, was not receiving any royalties, and because he believed that his patent was "dormant" or had "lapsed" at the time of his bankruptcy filing. Audio, 10:00-10:02.[5]

Finally, Mr. Krywopusk notes that the value ascribed by the debtor to his Honda vehicle was not consistent. On Schedule B, the value was $13,500. On Schedule D, it was $14,500, and in a proposed reaffirmation agreement, ex. P-14, which agreement was not approved by this court, see docket entry #43, the value is listed at $19,700. Id.[6]

---

[5]In addition, the debtor's statement of financial affairs refers to a 2004 lawsuit he brought against a Mr. Schmuckler and others, without noting that the lawsuit had been resolved. Although mentioned in his financial statement, that claim should have been included among his assets in Bankruptcy Schedule B if the litigation was unresolved or had been resolved in the debtor's favor.

[6]Mr. Krywopusk also offered evidence that he believed demonstrates that the debtor: failed to disclose on his 2008 federal tax return his receipt of rental income from the Brigantine properties; failed to tender mortgage payments owing on the 5100 Ocean Drive property although he had sufficient funds with which to do so; and erroneously answered in discovery the date of his last payment on his home mortgage. The debtor offered an explanation at trial as to each of these issues. I find either that the explanations were credible or the issue is not germane to my resolution of this adversary proceeding. For example, numerous courts have held that section 727(a)(4)(A) does not apply to prepetition tax returns, as they are not made under oath in connection with a bankruptcy case. See In re Klutchko, 338 B.R. 554, 568-69 (Bankr. S.D.N.Y. 2005) (section 727(a)(4) does not apply to filing of false tax returns); In re Beeber, 239 B.R. 13, 29 (Bankr. E.D.N.Y. 1999) (false oath consists of statement made in schedules or 341 meeting); In re Frommann, 153 B.R. 113 (Bankr. E.D.N.Y. 1993) (complaint fails to show how the income tax returns constitute a false statement made under oath during the course of the bankruptcy proceedings).

II.

As noted earlier, although Mr. Krywopusk's complaint mentioned 11 U.S.C. § 727(a)(2)(A)—denying a discharge when a chapter 7 debtor has transferred and/or concealed property with the intent to hinder, delay, or defraud at least one of his creditors within one year of the bankruptcy filing—he offered no evidence on this issue and his post-trial memorandum does not refer to it. Instead, the evidence presented concentrated upon 11 U.S.C. § 727(a)(4)(A), which provides that a chapter 7 debtor will be denied a bankruptcy discharge when he:

> knowingly and fraudulently, in or in connection with the case–
> (A) made a false oath or account[.]

In general, an individual debtor will be granted a discharge in bankruptcy unless one of the specified exceptions found in section 727(a) applies. In applying those exceptions, courts have recognized that denial of a debtor's discharge is a harsh sanction. See In re Gioioso, 979 F.2d 956, 962 (3d Cir. 1992); In re Gudowitz, 1986 WL 28906, at *3 (Bankr. S.D.N.Y. 1986). Accordingly, "[c]onsistent with the 'fresh start' policy underlying the Code, these exceptions to discharge should be construed strictly against the creditor and liberally in favor of the debtor." Matter of Juzwiak, 89 F.3d 424, 427 (7th Cir. 1996); Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) ("Completely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly."); In re Adeeb, 787 F.2d 1339, 1342 (9th Cir. 1986).

Nevertheless, courts have also acknowledged that, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." Matter of Juzwiak, 89 F.3d at 427; see, e.g., In re Luby, 438 B.R. 817, 826 (Bankr. E.D. Pa. 2010). Thus, where a debtor has been dishonest in his dealings with the court or his creditors, it may be appropriate to deny his discharge, notwithstanding that an underlying goal of federal bankruptcy law is to provide a debtor with a fresh start. "While the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice." Kentile Floors, Inc. v. Winham, 440 F.2d 1128, 1131 (9th Cir. 1971); see In re Luby, 438 B.R. at 826.

The congressional purpose in enacting section 727(a)(4)(A) was to establish an "affirmative duty" for the chapter 7 debtor to completely disclose "all assets [and] liabilities and to answer all questions [pertaining to his/her financial affairs] fully and with the utmost candor." In re Maletta, 159 B.R. 108, 112 (Bankr. D. Conn. 1993); see generally In re Phillips, 2012 WL 1071270 (11th Cir. 2012). As recognized by one court, "[t]he purpose of [section 727(a)(4)(A)] is to allow creditors to have adequate information of the [debtor's] estate without the need for an examination or investigation to determine if the statements are correct." In re Hiegel, 117 B.R. 655, 659 (Bankr. D. Kan. 1990); see In re Gudowitz, 1986 WL 28906, at *4; see also In re Haverland, 150 B.R. 768, 772 (Bankr. S.D. Cal. 1993) ("A trustee or creditor should not be required to make a costly investigation . . . to uncover the existence of property which the debtor knowingly fails to disclose.").

10

In other words, section 727(a)(4)(A) seeks to insure that the chapter 7 debtor has made full, honest and accurate disclosure of his financial circumstances so the bankruptcy trustee and creditors have sufficient information for the proper administration of the chapter 7 case without having to incur the time and expense of an investigation into his affairs. See In re Aubrey, 111 B.R. 268, 274 (B.A.P. 9th Cir. 1990) ("[T]he opportunity [for the debtor] to obtain a fresh start is thus conditioned upon truthful disclosure."); In re Burnley, 1999 WL 717215, at *3 (E.D. Pa. 1994). Especially given the large numbers of bankruptcy filings each year, the bankruptcy process depends upon the complete and candid disclosure of assets, income, expenses and liabilities of the debtor. See generally Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988) (failure to disclose a claim in a bankruptcy case may judicially estop the debtor from later asserting that claim in other forum). Thus, it is understood that a debtor's subsequent amendments to her schedules may rectify an honest mistake, but cannot expunge any fraud in the falsity of an oath on the original schedules. See In re Leech, 408 B.R. 222, 228 (Bankr. E.D. Wis. 2009); In re Kelly, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992); In re Montgomery, 86 B.R. 948, 957 (Bankr. N.D. Ind. 1988); see also In re Wade, 189 B.R. 522, 526 n.1 (Bankr. M.D. Fla. 1995); see generally Payne v. Wood, 775 F.2d 202, 205 (7th Cir. 1985) ("The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive. The omission of assets may be a good reason to deny or revoke a discharge.").

A creditor objecting to a debtor's discharge under section 727(a)(4)(A) has the burden of proof. Fed. R. Bankr. P. 4005. To meet that burden, the creditor must

11

prove by a preponderance standard, see, e.g., In re Phillips, 2012 WL 1071270 (11th Cir. 2012); In re Georges, 138 Fed. Appx. 471, 472 (3d Cir. 2005), that:

> (1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. False oaths sufficient to justify the denial of discharge include (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings.

Matter of Beaubouef, 966 F.2d 174, 178 (5th Cir. 1992) (citations and quotations omitted); see, e.g., In re Pratt, 411 F.3d 561, 566 (5th Cir. 2005); Williamson v. Fireman's Fund Insurance Co., 828 F.2d 249, 251 (4th Cir. 1987); In re Strickland, 350 B.R. 158, 163 (Bankr. D. Del. 2006). A chapter 7 debtor's bankruptcy schedules and statement of financial affairs are submitted under oath. See Fed. R. Bankr. P. 3008. Accordingly, a material "false statement made in a bankruptcy petition, schedule or statement of financial affairs constitutes a false oath within the meaning of [s]ection 727(a)(4)(A)." In re Senese, 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000); see In re Strickland, 350 B.R. at 163 (citing Fed. R. Bankr. P. 1008 and 28 U.S.C. § 1746).

While an omission or false statement caused by an honest mistake or oversight will not be sufficient to deny the chapter 7 debtor his discharge, see also In re Georges, 138 Fed. Appx. at 472, an omission or misstatement made with a "reckless indifference to the truth" will fall within the scope of § 727(a)(4)(A) if the subject matter is material to the administration of the bankruptcy case. See, e.g., In re Bren, 122 Fed. Appx. 285, 286 (8th Cir. 2005); Matter of Beaubouef, 966 F.2d at 178; Cadle Co. v. Zofko, 380 B.R. 375, 382 (W.D. Pa. 2007); In re Von Kiel, 461 B.R. 323, 341 (Bankr. E.D. Pa. 2012). Furthermore, "[t]he subject matter of a false oath is material, and thus

12

sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984) (internal quotations omitted); see In re Phillips, 2012 WL 1071270 (11 Cir. 2012) (unpaginated). In re Sholdra, 249 F.3d 380, 383 (5th Cir. 2001) ("As we have noted, '[f]ull disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential.'") (quoting Matter of Beaubouef, 966 F.2d at 179).

In consideration of when a false statement is made knowingly, one court has explained:

> A statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth. Where persuasive evidence of a false statement under oath has been produced by a plaintiff, the burden shifts to the defendant to prove that it was not intentionally false . . . .
>
> Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel. Furthermore, a debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.

In re Maletta, 159 B.R. at 112 (internal quotations and citations omitted); see In re Mitchell, 102 Fed. Appx. 860 (5th Cir. 2004) (reckless indifference to truth supports denial of discharge under section 727(a)(4)); see also In re Chavin, 150 F.3d 726, 728 (7th Cir. 1998) ("[N]ot caring whether some representation is true or false—the state of mind known as 'reckless disregard'—is, at least for purposes of the provisions of the

13

Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material.").

As noted above, a debtor's liability under section 727(a)(4) requires that the false oath be made with fraudulent intent and not inadvertently. As with § 727(a)(2)(A), fraudulent intent may be inferred:

> The problems inherent in ascertaining whether a debtor has acted with fraudulent intent are obvious. Ordinarily, the debtor will be the only person able to testify directly concerning his intent. Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case.

In re Williamson, 828 F.2d at 252 (internal citations omitted); Chusid v. First Union National Bank, 1998 WL 42292, at *7; In re Singh, 433 B.R. 139, 159 (Bankr. E.D. Pa. 2010) ("Because debtors will rarely to admit to fraudulent intent, the requisite intent necessary for the denial of discharge under § 727(a)(4)(A) may be inferred from circumstantial evidence, such as a pattern of nondisclosure and concealment."); In re Senese, 245 B.R. at 575 ("Direct evidence of fraudulent intent is not required; rather, it is sufficient to prove by circumstantial evidence either a pattern of concealment and errors or other conduct that suggests reckless indifference to the truth.").

Thus, reckless indifference to the truth can be inferred from numerous errors and omissions in the bankruptcy schedules or statement of financial affairs. See, e.g., In Re Corona, 2010 WL 1382122, at *9 (D.N.J. 2010); In re Kiel, 461 B.R. 323, 341 (Bankr. E.D. Pa. 2012). Moreover, a court may take into account the demeanor of the debtor, when the latter is testifying at trial, in assessing whether those errors and

14

omissions stemmed from "reckless indifference" or were inadvertent, honest mistakes.

See In re Singh, 433 B.R. at 159.

III.

After consideration of all of the evidence presented and my review of the parties' post-trial submissions, I conclude that Mr. Raftogianis was recklessly indifferent to the truth of the information he provided in his sworn bankruptcy schedules and statement of financial affairs; furthermore, his lack of candor concerned matters material to the administration of the case.

First, the debtor's bankruptcy schedules and statement of financial affairs had omissions and contradictions that would be obvious to anyone reading them with a concern for their accuracy and truthfulness:

> a. Schedule B asserts that the debtor, who owns a home and avers on Schedule I to be single, owns only a vehicle and a small bank account. No other items such as furniture, clothing, electronic equipment, or tools are disclosed;
>
> b. The debtor's valuation of his vehicle differs between Schedule B and Schedule D, which schedules were filed on the same date;
>
> c. Schedule J identifies no mortgage expense. Schedule D lists a creditor holding a mortgage on the debtor's residence. Therefore, the inference is that the debtor is delinquent in his mortgage payments. Nonetheless, the Statement of Financial Affairs omits the pending foreclosure action. Similarly, although the Statement of Financial Affairs identifies litigation in which the debtor is the plaintiff, Schedule B omits disclosure of this asset;
>
> d. Schedule I avers that the debtor receives $2,000 per month in "other income." The Statement of Financial Affairs

15

asserts, however, that the debtor had only $650 in total income for 2010 and $650 in January 2011;

e. Although claiming that his income was only $650 in 2010, and although averring that his monthly expenses, not including his mortgage payment, exceed his monthly income, the debtor nonetheless swore that he had only two unsecured claims—one arising from a business venture started years before and culminating in a judgment against him (and with this debt later reclassified as secured). It would seem highly unlikely, in such a financial condition, for any debtor to be current at the time of his bankruptcy filing with typical creditors, i.e., utility companies, auto insurers, health providers; and

f. If the debtor had no wages, salary or commissions but only "other income," as averred on Schedule I, his monthly expense for "union dues" listed on Schedule J seems anomalous.

Truthful information about monthly income and expenses is material to the administration of a chapter 7 bankruptcy case, especially after Congress enacted the "means test" for chapter 7 eligibility in section 707. See In re Fraleigh, 2012 WL 2121236, at *6 (Bankr. S.D.N.Y. 2012); In re Fontaine, 467 B.R. 267, 271 (Bankr. D. Mass. 2012); In re Von Kiel, 461 B.R. at 341. Truthful information about assets, liabilities and pending or recent litigation is also material within chapter 7 cases. See, e.g., In re Dawley, 2005 WL 2396489, at *3 (E.D. Pa. 2005); Casey v. Kasal, 223 B.R. 879, 884 (E.D. Pa. 1998); In re Hansen, 325 B.R. 746, 758 (Bankr. N.D. Ill. 2005) (among the material omissions was the failure to list a pending foreclosure action against him).

In addition, not apparent from Mr. Raftogianis's sworn schedules and statement is his omission of two assets: his loan claim against Mr. Imbarlina and his patent grant. Schedule B expressly requests information about all patents, question #22,

16

as well as all liquidated debts owed to the debtor, question #18. Question #35 is a catch-all query seeking information about any other assets.

Mr. Raftogianis's explanation at trial, essentially that he thought both assets were worthless, does not excuse their omission. See, e.g., Stamat v. Neary, 635 F.3d 974, 982-83 (7th Cir. 2011). First, it is the province of the chapter 7 trustee (and perhaps creditors in some instances), not the chapter 7 debtor, to evaluate the worth of his assets for purposes of case administration. See, e.g., In re Riley, 128 B.R. 567, 569 (Bankr. N.D. Okla. 1991):

> The Debtor is not to decide for himself the nature of his interest in property, the value of that property or the amount of his equity therein. Also, he is not to decide for himself which questions on the Statement of [Financial] Affairs should be answered fully, completely and truthfully. The Debtor cannot omit information required of him simply because he believes or decides the property omitted has no value or the information is not necessary. This is for the creditors and the Court to decide.

See generally In re Abramov, 329 B.R. 125, 134 (Bankr. E.D.N.Y. 2005) ("[E]ven worthless assets and unprofitable business transactions must be disclosed in the debtors' petition.").

Second, both of these assets may have value.

Mr. Imbarlina apparently is operating a restaurant in Pittsburgh at present. See http://www.epicurespalate.com. If New Jersey law governs the debtor's 2007 loan, and it appears that the Brass Monkey restaurant was located in Brigantine, New Jersey at the time of the loan, then a six year statute of limitations would apply. N.J.S. 2A:14-1; see Santiago v. Villoresi, 2007 WL 1790740, at *2 (N.J. Super. A.D. 2007) (six year limitations period on loan without a fixed maturity date begins when loan is made); Flynn

17

v. Sevastakis, 2006 WL 664180 (N.J. Super. A.D. 2006) (six year limitations period does not commence immediately on a "pay when able" loan). Even if Pennsylvania law were applicable, its four year limitations period, 42 Pa. C.S.A. § 5525(3), may not have expired as of the date the debtor filed his bankruptcy petition: January 21, 2011. If so, then the bankruptcy trustee would have two years to bring a collection suit. See 11 U.S.C. § 108(a)(2); see generally In re National Environmental Waste Corp., 200 F.3d 1266, 1268 (9th Cir. 2000); Official Committee of Unsecured Creditors of Corell Steel on Behalf of Corell Steel v. Fishbein and Co., P.C., 1992 WL 196768, at *3 (E.D. Pa. 1992). Mr. Imbarlina's present business operations could well permit recovery by a trustee of some or all of his outstanding loan obligation to the debtor.

  Moreover, the debtor's patent grant for snowboard assemblies, issued on August 12, 1997, may, depending upon its classification, be in effect for 14 or 20 years. Compare 35 U.S.C. § 154 (utility patent grant is for 20 years) with 35 U.S.C. § 173 (patent for design is granted for 14 years). In either instance, the grant had not expired when the debtor commenced his bankruptcy case in January 2011. If the debtor's patent is considered as a patent for a design, see 35 U.S.C. § 171, then there was no renewal fee owing. See 37 CFR § 1.362(b). If a renewal fee was owed under 37 C.F.R. §§ 1.362(a), 1.366(c), and was not timely paid, then, depending upon when the renewal fee was due, the trustee may have been able to cure that deficiency pursuant to 37 CFR § 1.378, paying the requisite renewal fee from funds either derived from non-exempt property or through an arrangement with a prospective purchaser.

  The debtor also conceded that he chose to omit the debt owed to his father from his schedules. And he included Wells Fargo as holding a second mortgage on the

property located at 5100 Ocean Drive when it held no such claim.  His failure to review loan documents that would have revealed all mortgage holders underscores his lack of concern for the accuracy of those sworn bankruptcy filings.  See In re Crumley, 428 B.R. 349, 367-68 (Bankr. N.D. Tex. 2010).  His background in the lending industry gave him the ability to understand those documents.  See In re Gray, 295 B.R. 338, 344 (Bankr. W.D. Mo. 2003); In re Riley, 128 B.R. at 570.

Indeed, his demeanor at trial was reflective of one who had determined in his own mind that his assets had only nominal value and thus full, accurate disclosure of his financial affairs to the trustee and creditors was unimportant, and not worth his time and effort.  See In re French, 499 F.3d 345, 353 (4th Cir. 2007) (evaluation of demeanor relevant to determining fraudulent intent).

Taken together, the numerous errors, omissions, and inconsistencies noted above, plus the debtor's demeanor at trial, demonstrate that Mr. Raftogianis exhibited a reckless indifference to the truthfulness of the sworn information he provided to the chapter 7 trustee and his creditors when signing and filing his bankruptcy schedules and statement of financial affairs.  Moreover, those errors, omissions and inconsistencies were material: concerning his assets, liabilities and income.

Accordingly, an order will be entered denying the debtor his chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(4)(A).[7]

---

[7] I appreciate that the chapter 7 trustee filed a report immediately after the meeting of creditors that there were no non-exempt assets available for distribution to creditors. However, no transcript of the meeting was offered in evidence and the chapter 7 trustee, Mr. Arthur Liebersohn, died on February 29, 2012, and so was unavailable to testify.  Therefore, it is unknown whether the trustee's report was based upon complete information, such as knowledge of the Imbarlina loan and the patent.  Furthermore, Mr. Krywopusk attended the creditor's

(continued...)

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: July 12, 2012

---

[7](...continued)
meeting. Thus, to the extent the trustee was provided with more accurate information of the debtor's financial affairs, one cannot determine if such additional accuracy was the product of the debtor's voluntary actions, or of information provided by or exposed by that creditor. See In re Abramov, 329 B.R. at 133-34 (knowing inaccurate information on the debtor's bankruptcy schedules is not cured by providing different information at the creditors' meeting).